Good morning. We have one case today, which is No. 14-5045, Englewood Terrace Limited v. United States. Mr. Peel. Good morning, and may it please the Court. The interesting issue this appeal raises relates to damages and causation. The central issue and error we contend that the trial court committed here was finding that remote consequences were offsets or breach savings, as we call them in our reply, that should be applied to reduce lost profits previously found by the trial court. And we contend the trial court erred in that finding because this court already affirmed the trial court's finding that the foreclosure of the Riley mortgage here at issue was not proximately caused by HUD's breach of the HAP contract at issue. Put aside the Riley mortgage, the payments out of the Riley mortgage. That doesn't include the repairs. Those expenses were never paid, correct? There are a couple sets of repairs, so let me just be sure I'm understanding Your Honor's question. There was one category of major repairs of $3.5 million, which were estimated and based on pre-Riley loan estimates of what might be required to be done to the project, and those were dating from 2001, and those were actually never ruled on by the trial court. No, I understand your contention they weren't ruled on, but the $3.5 million of expenses, which is based on an estimate that you provided, I think it was Exhibit 220 or 230, those repairs were never made and paid for, correct? Those were not, Your Honor. More extensive repairs were, in fact, made pursuant to the Riley mortgage. And with respect to the maintenance expenses, do you contend that those payments were made? Operating expenses were paid by Englewood during the contract damages period, and the hypothesized operating expenses, again, we contend were not ruled on by the trial court and were, in fact, created based on projected expenses of the project rather than actual expenses. Okay, but what the trial court said was you have the burden of proof and that you didn't bring in any evidence to show what the expenses were or were not, and that she said she gave you four opportunities to do that and you didn't come in with evidence. So what's the response to that? Well, there was evidence. That was in the form of the general ledgers, which had earlier been admitted in the case for all purposes and without restriction as to the use to which they might be put. Well, she found that they were inadequate for that purpose. Well, this court's case law, in other instances, finds accounting records to be sufficient proof of damages, and we contend she erred in requiring too stringent proof of damages in this regard. Okay, so the only evidence that you presented to her were the general ledgers, right? The evidence of the actual expenditures, yes, that was in the general ledgers. But also in Mr. Samuelson's testimony. Also in Mr. Samuelson's testimony, absolutely correct, Your Honor. And in addition— Where did Mr. Samuelson testify that there were no saved expenses? I'm sorry? Where did Mr. Samuelson testify that there were no expenses saved? Those were set forth in the briefs on remand. There was not testimony taken on remand. Okay, but what she said was you didn't put in any evidence. So what I'm asking about is what evidence was there in the record? The evidence— She says that the only thing that you offered were the general ledgers. They were insufficient. I'm asking what other evidence was there? When the general ledgers were introduced into evidence in the trial court proceedings, Mr. Samuelson offered testimony about the manner and means in which they were created. I believe that's the testimony to which I was previously referring, Your Honor. So it's foundational testimony relating to the general ledgers. So basically your whole case depends on our accepting the proposition that she improperly rejected the general ledgers. No, Your Honor. And let me explain why that's incorrect from our perspective. First, the trial court never ruled on either the projected operating expenses of $1.8 million or the major repairs of $3.5 million. That's clearly set forth on page 829 of the appendix. The last page of her opinion says, I don't resolve the disputes regarding those issues. And there were clearly factual disputes in the record. There was evidence of actual construction made pursuant to the Riley loan that was far more extensive than the $3.5 million estimate, for example. But she never ruled on that factual issue, finding it unnecessary because the Riley-financed expenses themselves were larger than the lost revenues previously awarded. So our contention is, Your Honor, that the only thing the trial court ruled on were the Riley-financed expenses. And as to those, there's a proximate causation problem with that. Well, she said that she didn't present any evidence as to what the foregone expenses would or would not have been, other than the general ledgers. And she found that insufficient. Is that an incorrect statement? She made statements to that effect in her opinion, but they didn't seem to be part of her ruling, Your Honor. And perhaps I'm misreading her opinion in that regard. Was the trial court correct that you agreed below that the Riley loan paid the six categories of expenses and cost, the CIC debt service, the balloon payment, the Michigan National Bank loan debt, the real estate taxes, the insurance payments, and the Riley loan interest payments? Riley monies were used to meet those expenses, Your Honor. There's evidence in the record. So she is correct that you agreed to that? Yes, that's not a factual dispute. Okay, because it seemed to me you were arguing otherwise in your reply at page 20. If I could address that in rebuttal, Your Honor, I'll look at page 20. Okay, sure. Yeah, because that's – it mixed me up there. So if you're not arguing that she was incorrect, that's fine. The larger point we are arguing is that money is fungible. So whether it comes from a lender or comes from a capital contribution of Englewood or comes from the Illinois Housing Department Authority or Riley, money is money, and so it doesn't matter. And there was money put forward at closing in December of 2002, which included the Riley mortgage proceeds. It included proceeds from IHDA, and it included 100-some thousand of capital contribution by Englewood, funds that are not shown to have been contributed by a lender. So depending on which dollars you say went to which things, one could make an argument that at least some of the expenses were funded out of other things. The truth is, with respect to the way that the Riley loan worked, many of the payments made through the Riley loan never came to Englewood and then Englewood back to the vendor. For example, the construction interest payments, those were capitalized into the loan, so the loan – the bank basically paid itself once those draws were approved. I'd like to return, please, to the major repairs and routine operating expenses. Is it correct – I want to make sure I understand the facts – that the general ledger and the issues regarding whether the general ledger establishes payment or doesn't establish payment, that's only related to the operating expenses, right? That's the $1.8 roughly million attributed to the operating expenses. That doesn't have anything to do with the major repairs. That's a separate category, right? Yes, Your Honor. Their assertions as to major repairs are based entirely on estimates that were prepared prior to the Riley construction program. Right. But let me ask you, one of the things the government argues is even if you wouldn't have – we're looking at a two-and-a-half-year snapshot of that South Point property. What would have needed to be done or what would the expenses that would have been occurred during this two-and-a-half-year window? And one of the things the government argues is even if you wouldn't have had to do all of the major repairs for which you had received an estimate of $3.5 million, at a minimum you would have had to do the repairs necessary to bring the property up to code compliance. There are several places in the record where I see in that estimate that there was an attachment, which is not in the record, that talks about the building having been found not in code compliance, for example, with regard to smoke detectors or the garbage chute and the cover of the garbage chute not properly closing so the chute doesn't operate properly. There are a few instances of specific expenses that you've got estimates for that seem to be unequivocally by the estimate itself because those things were found to have failed the city or state code requirements. Wouldn't those have been expenses that you absolutely would have had to have incurred in that two-and-a-half-year snapshot since they were things for which you were found to be out of code? So even if not the whole $3.5 million is on the table, at a minimum isn't it necessary for her, not me, I'm not a fact finder, but to go back and sort through the $3.5 million and figure out and wouldn't it be reasonable for her to say, well, certainly the ones that require code compliance are things you would have incurred? If I understand Your Honor's question, yes, is the answer to that. Our belief, however, is that the $3.5 million is wholly encompassed and subsumed within the much larger $7 million plus construction program undertaken in connection with the Riley loan. And in our but-for world, we assume the Riley loan exists and we are servicing that loan during the damages period. So all of those other major repair issues that were identified back in 2001 and periods before the December of 2002 Riley loan would necessarily have been addressed and subsumed and taken care of by the Riley funded construction program that was commenced. Okay, but where in the record? I did not understand that the $7 million in repairs were made. I thought, in fact, in the exchange in the argument in the Court of Federal Claims, you agreed that the $7 million had not been spent. Where is the evidence in the record that the $3.5 million were actually made? Your Honor, I'll point you to the specific page in the appendix reflecting the expenditures made for construction. If I could do that in my rebuttal time. Well, it's pretty key. I mean, my understanding is that you said or counsel Frankel had said that those repairs were not made. There's one looks at the second volume of the appendix. Page a 1133.4970. That's a listing of construction payouts by number, date, amount and cumulative totals as of September 10th, 2004. Reflecting 1133.4970. Okay. That's a schedule listing out the payments that had been made as of April 2004 on the construction account, which is in excess of 5.7 million. There are later documents back showing the closing out of the lien claim that the contractor had on the property, showing that there was a certificate of completion issued in May of 2004 by Duffy, the contractor who completed the construction. That's also in the record. And I will try and quickly identify that for your honor as well. I have a question. Are you saying that these expenses here actually are some of or maybe all of the major repairs that were discussed in the three? Because I thought the roof was never fixed, for example. So are you saying, you know, the 3.5 million are a precise itemized list of expenses, and I thought some of those repairs were not in fact made. Are you telling me that no, in fact, all of those repairs were made? Or are you saying, wait, some of them were made. Here's evidence of it. You got to send it back to her for fact finding on which ones were or weren't. What are you saying? I'm saying both, your honor. I'm saying the construction that was actually undertaken pursuant to the Riley loan was more extensive to renovate the building to a light new condition, which was higher than the decent, safe and sanitary condition of the building. Where's your foundational document for 4970?  That's not. Your honor, I'm sorry. I'm fumbling here. I do, I will give the court specific page references from court filings reflecting the mechanics lien procedure from the general contractor, reflecting a certificate of completion was issued in May of 2004, reflecting that an entire balance of nearly 8 million was expended in construction. This is inconsistent with what you said, what you told the court of federal claims. Look at page 383 of the record. She specifically asks you about the major repairs that are referred to were discussed and outlined in August of 2001, but they actually were expended or not. Mr. Samuelson, no, they never materialized. Okay. So these dates we're talking about just for major repairs. Yes. Let's be very precise, please. But they were never paid. They were never incurred. They were not made. They were not incurred. They were not paid. How is that consistent with what you're just telling us? I think there may be some talking past one another right here. What my understanding of Mr. Samuelson's saying at that hearing was that the specific program of construction outlined in the 2001 proposal was never a proposal that was put into effect, which is not to say that a more extensive proposal wasn't later. Well, that's inconsistent with what he said. He said he was specifically asked by the court whether they were ever paid, and he specifically said no, they were never paid. Repairs were made, Your Honor. I think, again, the court didn't address this on its findings, so certainly a remand could clarify and illuminate these factual issues in the record. I see that my time has expired. All right. We'll give you two minutes for rebuttal. Mr. Peel. May it please the court. I think what's being demonstrated here is exactly the problem that Judge Horn had at the trial level. Despite giving Anglewood four attempts to try to prove their case, they never really submitted substantial evidence that actually showed that repairs were made, expenses incurred. It was a jumbled mess. I was going through the ledgers last evening that they produced that their whole case relies upon, which Judge Horn determined were admitted for the purposes of gross revenue, which the court reversed in its prior opinion. And if you look at the ledgers from, like, say, 987. Does she actually, when they're admitted, expressly indicate that they're admitted for a limited purpose? I don't know if there's any language that she's – There isn't. There isn't.  In her follow-on opinion, what does she precisely say about the nature of the admission of the ledger? She says in the prior opinion that's currently on appeal that the general ledgers were used primarily for the purposes solely of gross revenue, approving their revenues. They were not – there was no demonstration whatsoever that there were any expenses incurred or that they were saying these were our expenses. So when we – But what I want to understand, I want you to be precise, was she admitting them for a limited purpose or simply finding them insubstantial as a matter of evidence to prove the point of the expenses? Because I didn't see any government objection at any point in time. I didn't see any, you know, motion in limine about the nature of the use of the ledgers that would be appropriate. I saw nothing on the part of the government that would warrant diminished use of the general ledgers either by request or motion or otherwise. And so I want you to be precise about what you believe it is that she expressly determined about the nature of the ledgers as evidence. Yes, thank you. And that's a fair point. I apologize to the court. Yes, we initially objected at trial because during the discovery phase we were providing nothing on damages beside making the request. We saw a compilation for these general ledgers, and we asked that the court not admit them for the purposes to prove angle as damages, which we understood to be gross revenues or that they wanted the delta between the actual revenues that they would have obtained but for the breach, less the revenues that SHAP vouchers provided. A month later, after not receiving any information that showed any of this information, you're right, they were admitted. Did we specifically say we were admitting them for the sole purpose of only general revenues? No. When a document's admitted, it's admitted. But it's admitted. But to the second part of your question, you're absolutely right. In hindsight, maybe we should have been more precise. But in this case, though, the court, through all the briefings, understood that Englewood was putting these exhibits on or ledgers on to prove the revenues lost because that was their theory. And in the subsequent opinions, she made reference to that, that the fact that these were solely put on as testified by Mr. Samuelson to show gross revenues or lost revenues. And moreover, it became the weight of an evidence issue. So we had Mary Anderson, who was the person who dispersed the funds post-breach, claiming exactly what were paid and what wasn't paid and what expenses were paid. But even let's assume that the ledgers were admitted for the purposes of showing the expenses. If you look at the ledgers, by looking at the ledgers, and I looked at them last evening, from like, say, 987 to the end of 1014, there is no evidence that Englewood made any of the payments it says it made. There's nothing that says it made a $1.7 million payment. There's nothing that says it made a $750,000 payment. It's nothing that said it made any type of payment. That's why I ask for the foundational documents that the counsel is supposed to provide. I mean, I, I, I. The claim about the general ledgers is limited to the maintenance expenses, right? It doesn't have anything to do with the repairs. Well, under the. That part that I read seemed to concede that they never made the repairs. They never paid for. Right. That was a concession that Mr. Samuelson stated. I don't believe it was a limited concession. Well, what I'm saying is that the issue about the general ledgers relates to the $1.8 million in maintenance expenses. It doesn't. There's no claim that the general ledgers show repair payments, right? That's absolutely true. We're not aware of any major repairs. That's true. But even assuming the claim of $1.8 million, if you look at the general ledgers from 2002 going forward, the numbers don't add up. And that's what Judge Warren found was the problem with the ledgers as, as substantial evidence. But I think that maybe we should move on to the major repairs. Because if we agree with you, there's a stipulation in this case to the government's assertions about the six categories. And the routine operating expenses are, I think, stipulated to be in the amount, right, of $1.8 million roughly. Right. Right. So we kind of, if we agree with you on the general ledger not overcoming or establishing by clear, that she clearly erred in finding they failed to meet their burden on those, that still doesn't get to the $3.2 million. I want you to put aside everything related to the Riley loan. The only category left that I can tell is the major repairs. So I'd like you to focus on the major repairs for me and see how do we get to $3.2 million. Or say we're at $1.8, right? How do we get to $3.2? Because it doesn't seem, she clearly and expressly did not rule on whether or not the major repairs were necessary, right? She did not rule because I believe the opinion, if not directly stated, is certainly implicit that she'd already found $4.2 million in obligations that were avoided. Yes. Yes, Your Honor, I agree with you. So that's why I want to ask you about, since she did not rule on whether or not the major repairs would have had to have been performed in the two and a half year window, correct? There is no evidence that we're aware of that shows where these routine maintenance was made. No, no, not routine operating expenses, major repairs. Major repairs, we don't find. There's no evidence that we saw where they've actually made the repairs or actually- Right, but there's also no proof that the repairs had to have been made in a two and a half year window. Didn't you expressly argue to the court when delineating between the major repairs listed in the $3.5 million estimate that some of these repairs were precisely required to bring the property up to code? Clearly, those would have had to have been done right away. And so I thought that there was some lack of clarity in this record. Certainly, plaintiff argued we didn't have to do all $3.5 million worth of repairs. I mean, just because you bring a contractor out to your house and tell him, take a look, what do you think needs to be fixed here? And how much would you charge me? It doesn't mean you have to do all those things. Very true, but one is it was plaintiff's burden, so it was plaintiff who had to put that information in. I thought the source of the $3.5 million was their own estimate. And based on this August 6, 2001 letter saying that the government said you had to make $6 million in repairs, but we think only $3.5 is required in the letter from Samuelson. It's not in the joint appendix. I don't know why it's not in the joint appendix, but it's available on PACER. It's available and we can submit it to the court. We did not add it or include it in the joint appendix primarily because the court – one, we didn't think it was in dispute. The court had made a factual finding that that was their estimate. To bring it up, I agree, Your Honor, to circle back to your question for the $3.5 million repairs. But the real issue was – I agree, Your Honor. The $3.5 million was the minimum amount of repairs to make it decent, safe, and sanitary. No, no. Who said that? Where did the district court say that? Where did Englewood say that? Englewood said that when they were responding to the REAC inspection. Show me what document or anywhere in this record where Englewood says they would have had to have performed all $3.5 million worth of repairs to bring the property up to safety. Englewood 5. I don't have the site, Your Honor, and I can submit it in a supplemental brief. But in Englewood 5, which was where we were found to be liable for the breach of the HAB contract, in response to the REAC report, Englewood submitted, as showing that they did the 100% inspection of what repairs would be done, the Ted Diné architecture report. So that was what we understood that Englewood was submitting to be $3.5 million. I thought the $3.5 million came from the Samuelson letter that I just mentioned. Well, yes. But the basis for that Samuelson letter, Your Honor, was the Ted Diné architecture report. But moreover, though – But didn't the August 6th Samuelson letter say we agreed that $3.5 million in repairs have to be made? I believe so, Your Honor. I don't have it in front of me. But I do believe that there's no dispute that we understand from the record that plaintiffs think that a minimum of $3.5 million needed to be made. Moreover, if you look to the Kennedy report, which was submitted with their loan application, that was basically in November – Well, check out right here. I mean at least as argued to us in this court. And so I think that's part of why I'm wanting you to show me in the record where there is proof that Englewood admitted $3.5 million had to be made during the damages period. Because, by the way, that estimate talks about Phase I repairs, Phase II repairs. That, to me, would imply some of these repairs are repairs that you'd be making right away, and others are less important repairs you'd be making at a later stage. And so on page 26, at least, of the Gravery, they expressly argued to us that there is no evidence in the record to suggest that the hypothesized expenses would have been incurred by Englewood during the damages period – the two-and-a-half-year critical window – in addition to the operating costs funded by the Riley loan. So I understood them to be arguing to us that that $3.5 million is a wish list, but that not necessarily things that had to be done right away. And that's why I thought I understood you to argue to the trial court, well, wait a minute, Judge. The code-necessary repairs, the repairs to bring the property up to code, clearly would have had to be done right away. Why would you make that argument if it wasn't in dispute as to which repairs had to be made and which ones did not? Why would you have made that argument? Because that was going to be – that would have been required to maintain the property in decent, safe, and sanitary conditions. Yes, but those were a subset of the $3.5 million. What you're arguing to me now is Englewood admitted that they would have had to do all the $3.5 million. I don't see that admission. And why would the government have argued and delineated between codex ones of the $3.5 million necessary to meet code and ones that were not necessary to meet code if there wasn't a dispute about the $3.5 million? That's what I don't understand. I think our arguments always were in response to Englewood's positions. And what I would circle back then, Your Honor, is that what we do know, what Englewood wanted, when the HAP contract was terminated and they applied for a 221D loan for HUD, they came forward and asked for about $6.6 million in construction requirements. Now, I will fully admit that part of that construction loan was to pay off some of their old debts. But the Kennedy report at 730-1 through 20, which is what was provided to the government, saying these are the needed repairs. Moreover, we know in May 2004 that Mr. Samuelson came back to HUD asking for $1.6 billion more for additional repairs. So we apologize to the court if we didn't specifically get into all the details as to what Englewood avoided from their obligations. But it really wasn't our burden. We were just putting these things up. We've asked plaintiffs since the beginning of this case, show us some canceled checks where you actually paid these costs, and that the government and the taxpayer didn't pay these costs, and they haven't shown those costs. Yes, but that's not any of the questions that we've asked you today. We're assuming, I think, that these are expenses that were not in fact paid. Have you, from any of our questions, understood us to be concerned over whether these were paid or not paid? I'm assuming the major repairs were not paid. I understand their argument to the contrary. But the question to me is, and that's what I've tried to get you to focus on time and again, is to what extent do we know those are repairs that would have had to have been incurred in the two-and-a-half-year window? Because that's the only thing that's supposed to offset the profit earned during that time period, right? Is expenses they would have incurred during that same time period. Those repairs, in addition to the mortgage payments and things like that, yes. But I guess it was, we were always going under the assumption that we felt that the minimum amount of repairs that were needed were those that they listed in the Diné report. So given the lack of evidence as to exactly what they thought that they were going to have to do, that's what we relied upon. The other option we had is we had Mr. Samuelson's admission that he thought $7 million in construction fees were required. We also have the Kennedy report that lists a laundry list of repairs. Let me just cut through. So I apologize that I don't have those answers for the court. If you want supplemental briefing, we'll gladly provide it. Let me just cut through with one question, okay? I asked your opposing counsel about six categories of expenses that the Riley loan paid in full. And he said he agreed that Indeed had, and they weren't disputing that. And I'm taking that as a given then. And it seems to me that the expenses paid, that he agrees were paid by the Riley mortgage, totaled $4 million plus, almost $4,300,000 more than the damages award. And if so, that's why the claims court reduced it to zero. Doesn't that simply end it? That was our argument below. And maybe that's why they stopped with the damages. The evidence, uncontroverted evidence, shows that the government- But he agrees with that amount spent. And that's the end of the case. And that's consistent, though, with the law. Englewood, in the record, had been losing money the previous three years. It's inconceivable, by having the government breach the contract, that it automatically becomes some profit factory that's generating profits over and over, especially given the conditions of the property. And we know the conditions of the property were bad, because even the first receiver report talked about that. My time is up. Subject to your questions, we ask that the court affirm the judgment of the trial court. Thank you, Mr. McLaughlin.  Thank you, Your Honor. Let me ask you about that August 6th letter from Mr. Samuels. You're familiar with that? I am, Your Honor. So doesn't he there say that $3.5 million in repairs are necessary? It's not a judicial admission. It's not a sworn statement. He later took it back in the record when it was discussed on the remand proceeding. So he said that was one line in a six-page letter that was never undertaken and never went to fruition. It's exactly the hypothetical that Judge Moore depicted where a contractor comes out to your house and you say, well, gee, maybe we could do this, that, and the other thing. In my very limited time, I'd like to point the court to a couple things. First, with respect to the construction undertaken by the Riley loan, this is found in page A160. This is one of the earlier opinions. The HUD-insured Section 221D4 loan required that Englewood restore South Point to like-new condition, a standard that went beyond the decent, safe, sanitary condition requirement of the 2000 HAP contract and REAC inspection. Therefore, the court's already found that the Riley construction program exceeded what the contract was requiring. Moreover, if you turn to page ñ in the appendix of page A4975 and A4976, you can see the original contractor's claim for mechanic lien submitted by Duffy. How do you get around the statement that Mr. Samuelson made to the court where she specifically asked him, were these payments made? Were the repairs paid for? And he said no. Because I don't think he understood that question to mean were these individual items ever completed? It was, was this program of construction outlined in this 2001 document undertaken? And that, the answer is no. So I don't think he understood the question in the same way that Your Honor now understands that testimony. I would also point Your Honor to the foundational documents for the schedule that we looked at earlier. Those can be found in the advance documents, which are found on pages, for example, A1109.4737. You'll see there that's one of the advance for insurance for mortgage proceeds, and you'll see the first item on that line is construction costs per form HUD-92488. That number then ties back to the schedule you saw later. There's also some other schedules in the appendix that itemize the draws and the amounts that went directly to the contractor. Those can be found in A1129, A1130, A1131. Excuse me. I saw that that was related to an application for insurance. I asked you for your foundational documents, not for the document to which they were attached. Do you have anything that shows me these things are true and accurate? They were produced by the government with no indication that authenticity was ever an issue, and they were admitted into the record without objection by agreement of the parties, Your Honor. I understand they're authentic. I'll accept they're authentic. Are they true and accurate? Yes, Your Honor. Was there any testimony to that effect? There was no testimony taken with respect to that. Well, okay. Thank you. All right. We're out of time. Thank you, Mr. Peel. Thank both counsel. The case is submitted. All rise.